and I'll call our next case, which is Lynn v. Westport Insurance Corporation, et al. Good morning, Your Honors. My name is Craig Fishman. I'm here for Mr. Lynn. My name is Craig Fishman. I'm here for Mr. Lynn, and I'd like to reserve two minutes for rebuttal. There are three cases, Your Honors, that I want to discuss. The first one is Selective Insurance v. Jaskoloka, and that is a Middle District opinion by Judge Munley. This is a case where a Department of Public Works employee who was loading a dump truck with leaves on the side of the road was struck and killed by another driver. The judge applied the Utica test and said there was a causal relation or connection because the employee was crushed between the other vehicle and her dump truck. The same thing happened here. Mr. Lynn, at pages 386, 387 of the Record on Appeal, testified that he was pushed into the flatbed by the other vehicle. As far as being vehicle-oriented, the court in Jaskoloka said, excuse me, as far as vehicle-oriented, the person was doing loading, which was part of their job. Well, but what they said there was the weight of the evidence established that the vehicle was running at the time of the accident. DeSedin repeatedly re-entered the truck, drove it forward as they cleared the brush. Moreover, DeSedin's co-worker testified they were at the point in loading the truck where Linda was about to pull the truck forward along the road when the accident occurred. So the whole concept there was the vehicle orientation. Here we have Mr. Lynn having walked back from his tow truck, realizing it will be of no use in what is going on here. And he has left it and is walking past the flatbed. So, and the only time presumably he's going to get back into the tow truck is after the flatbed has done its job. But the tow truck has no more role to play in this situation, does it? It does. And there are two points for that. First of all, there's a line of cases in the Commonwealth Court, and that's cited in our reply brief. The first one, it's Addyward v. Financial Responsibility Plan. And that was pretty much a bare bones opinion, just affirming the trial court. The fact situation in Addyward is actually mentioned in a case Southeastern Pennsylvania Transportation Authority v. Dunham, and that's at 668 A2-272. In that case, a person was moving from one SEPTA bus to another, crossing Broad Street in Philadelphia. And what the Commonwealth Court said was that due to the geographical and temporal proximity, there was an unbroken causal connection and continuum of being an occupant when moving from one bus to the other. In this case, Mr. Lynn was in the process of moving from one tow truck to the other tow truck, the regular tow to the flatbed. So under the Addyward, the reasoning of the Addyward case, that's a continuum of use. And he's actually considered to be an occupant of one of those vehicles. Now, the Commonwealth Court didn't say which bus the person was an occupant of. They just said the Addyward was actually occupying one of those two buses. Now here, didn't Mr. Lynn specify he was an occupant of the flatbed? Wasn't that his contention? In the complaint, he contended that he was an occupant of the flatbed. The insurance company filed a counterclaim saying, we don't owe you any insurance coverage. In our response to that, we alleged that he was either an occupant of the flatbed or of his tow truck. So it's part of the case. And it would be illogical to say that it's not part of Mr. Lynn's case as a plaintiff, even though it wasn't pleaded in the complaint, because you could deny the summary judgment motion of the insurance company based on our affirmative defense that he was an occupant of one vehicle or the other. How do we write the opinion to fulfill the last two prongs, the vehicle-oriented and the necessary to the, essential to the operation of? How would you write that? Okay. I want to go back to the Gascoloka case. And this was the second part of the issue as far as that point was concerned. The court said, the insurance company asserts there's an important distinction between the decedent in this case who was required by her employer to be outside the vehicle and the individuals in Utica and Fisher who were required by law to be outside their vehicle. They make too much of this distinction. Whether they were motivated to comply with a statute or to earn a paycheck, each of these individuals had compelling reasons to be outside of their vehicle. Mr. Lynn Required to be outside the vehicle, you would put as kind of a prong three and a half or? Well, no, I'm saying that he was vehicle-oriented because this is a flatbed tow truck. It will not load itself. It needs a human being to do two things. And Mr. Lynn was getting ready to do either one of two things. He was either going to go operate the levers on the truck or he was going to pull the cables off of the back of the flatbed and attach them to the disabled vehicle. And it's clear he's going to do it because he put his gloves on. He put his gloves on and he testified that he was going to do one of those two things in his deposition, as did the other driver, Todd Davis. They both said that. That, I believe, satisfies the phrase occupying because he was going to get in the vehicle. The way you get in a tow truck to use its controls is you either stand by the levers and operate it or you have to climb in and pull the hook down to attach it to the disabled car. The thing that distinguishes this case from the other cases where you have a good Samaritan helping someone out is that the good Samaritans try to collect under the policy for the disabled vehicle. He's not doing that. He's trying to collect underinsured motorist benefits on the car that, on the tow truck that he was going to help use. And this is something that he testified in his deposition was done 50% of the time. It was standard practice. They want to do it because it's, this was on Route 70 in Ross Draper Township, busy road, lots of trucks. It's a narrow road. So, it is good for the health and safety of the disabled vehicle driver as well as the other tow truck driver. It's something they do all the time. So, as far as the third problem, he was vehicle oriented because he was trying to get in it to operate it. How about the fourth problem? Well, he has to be engaged in a transaction essential to the use of the vehicle. It's a tow truck. It doesn't load itself. He's walking up to the tow truck to operate its controls. And that's consistent with Jan Skalewska. And he had a duty as an employee of the tow truck company to help out Mr. Davis when Mr. Davis said, hey, can you help me load this truck on so we can get out of here faster and safer. Is that in the record? I thought the record was somewhat equivocal on that aspect. The need or desirability of his staying. He testified, Mr. Davis, first at page 13 of his deposition transcript, A425, did you ask Mr. Lynn to help you load your truck once you arrived? And the answer was yes. That's also consistent with the testimony in Mr. Lynn's deposition. I don't have the page marked there.  So the fourth prong is he was engaged in a transaction essential to the use of the tow truck. It's not like the other cases where someone was trying to help out the disabled vehicle. He was trying to work the tow truck. And that's the most important thing in the case. Now, I want to go on and distinguish some of the cases that the district court relied on. In Huber, the injured party was injured while loading the car. But that wasn't a transaction essential to the use of the vehicle. Loading the trunk of a car may be an assistance to the driver or the owner of the car. But it's not essential. In this case, you have to load a car onto a tow truck to use the tow truck. That is the sole purpose of the flatbed. The Curry case, Mark Curry was my case. I actually argued that one in front of the superior court. Mr. Curry was using his pickup truck with a flashing beacon to mark his position on a runway at the Pittsburgh airport where he was measuring the compaction of the asphalt to see if it fit the standards. He was required by federal law to have the beacon light on top of the truck. What Judge Johnson said during argument and in his opinion was that the use of the truck was essential to his activity measuring the road surface. But that didn't satisfy the fourth prong because his activity was not essential to the use of the truck. But in this case, Mr. Lynn's activity was essential. You have to load the tow truck. In the Downing case, that was one of the good Samaritan cases. The injured person clearly wasn't occupying because his actions weren't related to the use of his own vehicle. In this case, we're not making a claim against the disabled vehicle. Our claim is on the insurance coverage for the tow truck. Mr. Lynn testified. He believed he owed a duty to the stranded motorist not to abandon them while waiting for the other truck to arrive. And once he was asked for help, he had to give it him. The Patiki case where the sand fell off of a work vehicle and an injured worker was directing traffic. Directing traffic is not essential to the use of the vehicle. His job wasn't to direct traffic. Mr. Lynn's job, however, was to load disabled cars onto a tow truck. And Patiki wasn't there at the scene solely to direct traffic. Mr. Lynn was there solely to help with the disabled vehicle. Finally, the other case, the last case that was relied on by the district court was Aetna versus Kemper. And that's, again, another good Samaritan case. I've reviewed that three times. The injured party was not a commercial tow driver as Mr. Lynn was. The last case that I wanted to discuss was the Caporella case, which is another eastern district case. And this is the one where a police officer was injured while assisting another officer. And he was entitled to make a claim against his own vehicle. They said he was vehicle-oriented because he intended to return. Well, again, this is similar to our case. Mr. Lynn, however, was going to the second tow truck, the flatbed, and his intentions were to either operate the levers or to work the pulling cable. It was an essential transaction in the Caporella case. So you would say Caporella is on point and should be followed. I actually think that Jaskoloka is the best fit, and the second best would be Caporella. I think all of the other cases can be distinguished for the reasons that I've said. I don't really want to belabor the issue. I've pretty much said everything I wanted to say. Does the panel have any questions? No, this will appear for me on rebuttal. Thank you. Good morning. Alan Molotsky for the defendant, Westport Insurance Corporation. We submit the lower court was correct in granting summary judgment that when you do the analysis, the lower court was correct that Mr. Lynn was not occupying the flatbed truck. He was not occupying the tow truck. And really, the starting point of the analysis has to be the policy language. I noticed that we didn't hear anything about the policy language, but we have a policy here, and the policy, if you go into the appendix, it's clear that you need physical occupancy, and then that Utica sets up an exception to physical occupancy, the UIM coverage endorsement. Aren't you saying that the occupying concept of the policy brings into play Utica and all of the cases related thereto? No, I'm first saying, Your Honor, that you need to have physical occupancy, and then Utica sets up an exception or an extension, I guess you would say, to physical occupancy. You don't actually have to be in the vehicle itself. Because this is a status case. He's not a named insured. But isn't Utica controlling? Aren't those cases applicable here? Oh, absolutely, yeah. But it goes to the reason why Utica is not applicable to the flatbed truck. He was never in the flatbed truck, and the lower court properly found, consistent with Downing. Downing was an Alan Bonk decision from the Superior Court, as well as, of course, the Pennsylvania Supreme Court from 1984. But you start with the definition of occupying. Occupying is in upon getting in, out, on or off. That's physical occupancy. We know that he doesn't satisfy that. So then you have to do the extension to the policy language. And you go into Utica. And what does Utica say? Utica says, and it's as construed by the Downing case, and those are the only two cases, really, that talk about the continuation issue. Because mostly you're always going back to your original vehicle. They say the whole idea here is that you're returning to your original vehicle. You're elighted from your vehicle, and you're going to return to your original vehicle. So in Utica, you had a situation where the court, twice in the same paragraph, says the decedent's fiance was waiting for the claimant, for the decedent to return to the vehicle to continue their journey later on. The continued use of the vehicle. Continuance is a clear requirement here in order to get to apply the Utica factors. That's what the lower court here found. That's why our situation has nothing to do with the Jaskolobah case or any of the other Eastern District cases. The only cases, again, that have talked about it, the only cases that have been on point that have talked about it have been Downing and Utica, and they both said, yeah, you have to have this continuation. And remember, we're talking about a – Well, he was going to get back into the tow truck. He was going to get – and we can talk about the tow truck. I'm only talking about the application of the Utica factors to the flatbed. And understand, we do have this argument we heard today concerning this 80-word case where the Commonwealth Court talked about a claimant moving from one bus to another bus. There's two points, really, to make about that decision. Number one, this whole idea of one continuous journey was never raised before the district court. Never raised at all. So the lower court never had an opportunity to consider that theory. But I think the Commonwealth Court actually supports my argument because they used the continuation theory. They say it's necessary to have continuation. That's the critical point in the analysis. We don't have any continuation. He was never alighting from the flatbed truck. He wasn't preparing to enter the flatbed truck. He was preparing to assist. He put his gloves on. If he had been in the flatbed truck, well, I guess that's a whole different game. If he had been operating the flatbed truck, if he had come there in the flatbed truck, started to do what he was doing and then was injured, yes, he's occupying that flatbed truck. But he wasn't Mr. Davis. Mr. Davis was the one who bought the flatbed truck. Why don't you tell us why the analysis doesn't apply to the co-driver? Well, of course, there's a four-point analysis, and we think that Mr. Lynn only meets number two. Number two is the physical proximity, and that's an easy thing. We don't think it meets number one, number three, and number four. And really, number four and number three, in some ways, are the most important thing that go hand-in-hand. Three is, are you vehicle-oriented or highway-oriented? Four is, were you engaged in a transaction essential to the use of the vehicle? What did the tow truck have to do with the accident? He basically abandoned the tow truck in order to go help his colleague load the vehicle onto the flatbed. He was going to get back in it then, right? Eventually, he would get back into it, but it's the same as all these other cases. It's just in Patika, the man stops to manage traffic. Of course, he's going to get back into it at some point, no doubt about it. But the question is, at the time of the accident, was the tow truck extraneous to what he was doing, or was it something that was a necessary part of what he was doing? That's why you have to say, let's suppose Mr. Davis, the operator of the flatbed, if he'd been injured, he brought the vehicle there, he had the lighting, he was doing something essential to the use of the activity at the time in question. But can we cut it quite that cleanly? How do we actually know? There could have been something go wrong with the flatbed, and who knows, maybe they would have had to turn the car around and tow it on the good tires, which then were the front tires. How do we know so clearly that there is this abandonment and extraneous? I mean, they're in a towing operation. To me, it's distinguishable from the other cases where the person was doing something that had absolutely nothing to do with the vehicle. They were off, the vehicle was there, it was just serendipitously sitting by the side of the road, and they were doing something else unrelated. I mean, the court here said there was an abandonment of the vehicle, or that he had already determined the tow truck was of no use. That was the testimony basically from the plaintiff himself, Your Honor. And what the testimony basically was that it became extraneous to plaintiff's efforts. I mean, these are findings as a matter of law that it's not related to. To me, there's some relationship there still. He drives there, and I think you go back to the basic scenario as to what's an undisputed fact. And we only have what Mr. Lind testified to, and the lower court summarized it really in its opinion, and we have it in our statement of the case, and counsel for Lind has it in his statement of the case. But what Mr. Lind says is, I got called, I brought my tow truck. I realized I couldn't use the tow truck once I arrived because there was no spare tire there. So I then called for assistance, and Mr. Davis showed up. And the employer, there's testimony from the employer to say that, well, it isn't really necessary to have two people do it. But he decided to stay, and it's fine that he decided to stay. But there was testimony about having tools in his tow truck, wasn't there? And what if he needed the tool? Well, he wasn't going to use it, but there was no testimony that it was. . . Then we get into speculation, Your Honor. Well, you get into speculation, but when there's a finding that something's totally extraneous. . . He testified that he's putting on his gloves to help load the vehicle. And so there's absolutely nothing to suggest that the tools, for example, in the tow truck were going to be of significance. He could have testified to that, but there's no testimony to that. That he's putting on his gloves, in the process of putting on his gloves, or he may have just finished putting on his gloves. And maybe a few seconds later, it may have been then, I think he was going to attach the cables to the disabled vehicle. Anything else about the tools? Then we get into speculation, Your Honor. And then you get into, I think, the findings not supported by the record. And, of course, this court has plenary jurisdiction and can look at the deposition transcripts of Mr. Landry and Mr. Davis, but I don't believe that there's any support in the record to suggest that the tow truck had any utility to the towing operation. And that's why we're different from this Caporello case. In Caporello, it's clear the police officer was just like the decedent in Utica, Your Honor. He stopped the car in the process of assisting another police officer when he's hurt. He's going to be returning to the car. The car is all one continuation. Well, but he was getting his car to leave then. I'm sorry. But the continuation there is he then got in the car to leave, did he not? He would have gotten in his car to leave. The police officer, yes. And isn't that what Mr. Lynn would have done? Well, but then Utica doesn't make any sense in that point of view because in Utica he gets out of his car to manage traffic, finishes managing traffic. He's always going to go back to his car. So it misses the point. And this court's really making a prediction as to what the Pennsylvania Supreme Court's going to do and what's a better indicator as to what the Supreme Court's going to do. But it seems to me that the Superior Court, as opposed to a federal district court opinion, suppose we find that Utica isn't consistent with Utica. It's possible, right? We would say, well, if Utica wants the Supreme Court in Pennsylvania, they may not have decided to wait. Absolutely, because it's your job, Your Honor, to predict what the Pennsylvania Supreme Court. And I would suggest that that gets into a public policy issue, too, about when do you properly use a Utica situation. We have to remember that Utica's decided under, really under the old no-fault law, even before we had underinsured motorist coverage. We didn't get underinsured motorist coverage until after this decision, until after the Motor Vehicle Financial Responsibility Law. You get to the old public policy, which was in effect for Utica, maximum feasible restoration. That was the old public policy that we used to see with these old no-fault cases, and even the old U.M. cases. Now we have U.I.M. coverage under the Motor Vehicle Financial Responsibility Law, and we constantly get all these decisions from this court, from the Pennsylvania Superior Court, from the Pennsylvania Supreme Court. You have to look at what's the public policy in terms of controlling rising costs. And so here we have somebody who's not the named insured under the policy. In fact, the named insured is paying workers' compensation, and so he's almost having to being forced to be, having to pay double, you might say, through his insurance company, mind you, but it still impacts the named insured. He pays the workers' comp, and then he's not the named insured, remember, and his employee is not occupying this vehicle. He got insurance only when the insured was actually physically occupying. It's contrary to the public policy of controlling rising costs. Isn't the real issue how we view the concept of extraneous to what he was doing? Was the vehicle extraneous to what he was doing? And it seems to me in Patika, the vehicle was extraneous to what they were doing. I mean, isn't that really the key, how we view that concept, how broadly or narrowly we look at that? I think when we talk about the tow truck, Your Honor, as opposed to the flatbed truck, you're absolutely right. He wasn't doing anything with the tow truck at the time of the accident, and that's why I maintain we're closer to the Patika situation, although, as Judge McClure points out, you could say that Patika is a wrong interpretation of Utica. But I do think it is, with respect to the tow truck, absolutely, that's the case. But it depends on what you mean by extraneous. Well, I guess maybe, are you engaged in a transaction? And extraneous is not one of the elements. So you have to go back to Utica. Are you engaged in a transaction essential to the use of the tow truck at the time of the accident when you're walking back to go to the flatbed? Was the tow truck going to have a role to play? So the question almost is an evidentiary issue. That's what the lower court did. The lower court found that the tow truck wasn't going to have anything to do with where we were going to be. And even, of course, you have the situation as pointed out by the plaintiff. In the original declaratory judgment action, there's not even any word about that he's occupying the tow truck. He says, oh, I'm occupying the flatbed truck, which I suppose is still part of the case in the sense that he filed a reply. He didn't file a firm of defense. He filed a reply to my counterclaim saying, well, maybe I was an occupant of one or the other. So is it in the case or is it not in the case? Well, I think... But is it right that because... I mean, it all boils down to the fact that the car was disabled with a flat tire. Yes. But for that, he would have gotten out of his tow truck, walked back to that car, and let's say the flatbed wasn't there, but he was in exactly the same position, and he got hit, and he's covered. But by virtue of the fact that a flatbed truck entered into the situation, all of a sudden, he's not covered. Well, that's really what it comes down to, Your Honor. But that's what all these cases come down to. The question is, do you meet all four elements? But what he is doing in the nature of his job and his relationship to his vehicle as vehicle, nothing really has changed. Well, I think that what he's doing... It's kind of when you look at the superior court opinion in Petitka, and the superior court says, well, we are very sympathetic to what the lower court found, that he was acting appropriately in an emergency situation, seeking to manage traffic, and yet the court dismissed that. The question really was, was he not doing something that was part of his job? The question was, was he doing something that met the four elements of Utica? Utica doesn't talk about experience. Utica says, was he vehicle-oriented? So was he tow truck-oriented? Was he engaged in a transaction central to the use of the tow truck? Not the flatbed, but the tow truck. Was there a causal relationship between the injury and the use of the tow truck? And I guess I don't see it, and I think that's why counsel proclaimed it originally when he filed his declaratory judgment, actually merely talked about he was occupying the flatbed. If he turned around and started back toward the tow truck, he'd been covered, right? If he had finished what he was doing, is that what you're saying? And then he was... Well, that's a... He's heading toward the tow truck. He's done what he's doing, so he's certainly vehicle-oriented, and was he engaged in a transaction central to the use of the vehicle at the time? He's going to be entering the vehicle. I think that's, yes, I think that's closer than to the Fisher situation, where if you're preparing to enter the vehicle and then you're injured, I think that is closer, Your Honor. But that's not the way these facts develop, and we all... And this is very fact-sensitive because of the way the Supreme Court set up the four elements for what is physically occupying in terms of extending what the policy means. Thank you. We'll hear from you, Roberto. The continued-use language in Utica was discussed on the insurance company's case. What if a plaintiff was injured while entering a car for the first time? First time you buy a car, you're injured. There would not be any continued use. There's no requirement of continued use in the Utica test. Look at the Fisher case. Mr. Fisher was dropped off to go hunting. He had not been in the car for many hours, and he was unloading his shotgun before he got back in so that he could follow the law. He hadn't been in that car for many hours. There was no continued use. The only reason why Utica says... mentions the word continued is to prove a transaction essential to the use of the vehicle, to prove temporal proximity, because Contra Schiene was probably like 97 feet away from his car, and he was walking back and forth to the police car to give the officer the information so he could begin using his car again. So I think the continued-use language is a red herring. The relationship of the tow truck to the accident is the continuum of use pertinent to prongs 3 and 4. Mr. Lin was vehicle-oriented and the transaction was essential. And that is from Atty. Ward, which I believe is the third most important case. He had his gloves on. He was walking. The testimony indicates he had his gloves on. He was walking alongside the flatbed 3 quarters of the way towards the rear bumper of the flatbed, and he was about 3 inches away from the flatbed at the time of the accident. So he was about to get in that vehicle to operate it. As far as the pleadings are concerned, if they are correct, and this isn't part of the case, the tow truck isn't part of the case, it makes no sense because we claim that he was an occupant of both vehicles, or either one or the other. But he never was in the tow truck, doesn't that... I mean, never was in the flatbed. Doesn't that make it difficult? No, because he was preparing to get in the flatbed. He was? Yeah. The way that you get in a flatbed is you reach over and you pull the cable to attach it to the vehicle behind it. A flatbed tow truck. Doesn't occupy mean get behind the wheel of? I don't think so. Or get in the cab of? I think you have to look at the specific vehicle. That may be the case for a car, but not for a tow truck or a dump truck, as in the... Well, the case that I cited from the Commonwealth Court... I'm sorry, the Jaskaluska case, which was the Eastern District. The person was not getting in the car. They were filling it with leaves and debris from the road. The court said, that's the function of a dump truck. It's the same thing. The function of a tow truck is to tow other vehicles. I think there are two ways to get in. She had been in and out. She had been in the cab of that dump truck in Jaskaluska. That's correct. But what is the job of a tow truck operator? It's to tow other vehicles. And I believe that it is reasonable and expected that if you're driving a tow truck, you're going to use the machinery on the tow truck to load other vehicles. And I think that operating the levers or climbing into the tow truck itself to get the cable to attach another vehicle is getting into it. Because you're operating the essential equipment of the tow truck. It's as much as getting into it as it is getting behind the wheel. You're operating the tow truck. You're just operating the back part of it instead of the front. What's the best case that we could cite from a predictive standpoint for us to decide what the Pennsylvania Supreme Court would do? Because that's really what we have to do. We shouldn't be making new law. We should be predicting that, ah, because of this, the Pennsylvania Supreme Court would rule your way. Well, the Atty. Ward Commonwealth Court case talks about the continuum of use. I don't know if the Supreme Court would be happy if you say the Commonwealth Court is the best way to predict what the Supreme Court would do. Well, it's the job of the Commonwealth Court to also predict what the Supreme Court would do to interpret the law. And we would have to find that they do a good job of that. That's right. In addition, I believe that the Eastern District in Caparilla and the Middle District in the Jaskaluska case did a very good job of predicting the way that the Supreme Court is going to rule on this issue. Thank you. Thank you very much, Counsel. The case is well argued. We'll take it under advisement.